# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
TERI ENNIS and JOSHUA ENNIS,    *
on behalf of B.E., minor child,      *         No. 16-1148V
                                     *
                  Petitioners,       *         Special Master Christian J. Moran
                                     *
v.                                   *
                                     *         Filed: April 13, 2026
SECRETARY OF HEALTH                  *
AND HUMAN SERVICES,                  *
                                     *
                  Respondent.        *
* * * * * * * * * * * * * * * * * * * *
```

Amber Diane Wilson, Wilson Science Law, Washington, DC, and Jennifer Maglio, MCTLAW, Sarasota, FL, for Petitioners;
Eleanor A. Hanson, United States Dep't of Justice, Washington, DC, for Respondent.

## PUBLISHED DECISION ON REMAND
## AWARDING ATTORNEYS' FEES AND COSTS[1]

After the entitlement phase of this case ended via a decision adopting a stipulation awarding Teri and Joshua Ennis $35,000.00 plus an additional $492.00 for a Medicaid lien, the Ennises requested attorneys' fees and costs, totaling $315,214.40. The Ennises were awarded $272,876.90, which is approximately 86 percent of the amount requested.

Dissatisfied with the reductions made for two experts whom they retained, Thomas Cupps and Omid Akbari, the Ennises challenged the deductions by filing a motion for review. While the case was on review, the Ennises sought additional fees and costs for litigating the fee

---

[1] Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This posting means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

request.  The Court granted the motion for review, vacated the underlying decision, and remanded for additional analysis.[2]

As to the original fee request, the Ennises are awarded $269,064.40, which is approximately 85 percent of the original amount requested.  The supplemental fee request is deferred.

## I.    Procedural History

### A.    Entitlement Phase

The Ennises alleged that that the influenza and measles, mumps, rubella vaccines (collectively "the vaccines") their daughter, B.E., received on February 13, 2015, caused B.E. to suffer from psoriasis and autoimmune hepatitis.  Pet., filed Sep. 15, 2016.  The Ennises were represented by Attorney Amber Wilson, who was then affiliated with the law firm, Maglio, Christopher & Toale, P.C.[3]

The litigation lasted more than eight years.  Throughout the entitlement phase of the case, Attorney Colleen Hartley represented the Secretary.  Relatively early, the Secretary recommended against an award of compensation because, in part, the Ennises had not presented a report from an expert.  Resp't's Rep., filed Jan. 19, 2017.  Thus, in anticipation of the parties retaining experts, a set of instructions for experts was issued in draft form on July 31, 2017.  After the parties did not interpose any objections, the Expert Instructions became final on August 16, 2017.

The Expert Instructions provide guidance about the minimum topics about which the experts should express opinions.  One of the introductory parts requires experts to disclose what material they have reviewed.  (This portion of the instructions is an attempt to follow the provisions of Rule 26(a)(2)(B)(ii) of the Rules of the Court of Federal Claims, which provides that an expert's report must contain "the facts or data considered by the witness").  The Expert Instructions state: "The report should identify all background information that the expert has considered."  Expert Instructions ¶ 2.a.  The Expert Instructions also provide guidance to the

---

[2] Three separate transcripts are referenced in this decision: the October 14, 2025 transcript from oral argument at the Court of Federal Claims (Ct. Oral Arg. Tr.), the transcript of the January 13, 2026 bench ruling at the Court of Federal Claims (Bench Ruling Tr.), and the transcript from the March 4, 2026 oral argument on remand at the Office of Special Masters (Remand Oral Arg. Tr.).

[3] During the litigation, Ms. Wilson stopped working for Maglio, Christopher & Toale and began to work at her own law firm.  When it appeared that the case was going to proceed to a hearing, Ms. Wilson added another attorney to assist her with trial.  However, the work of the attorneys is not relevant to determining the issues that the Court remanded, which are the reasonableness of fees associated with the experts.

experts whom petitioners retain for preparing their invoices.[4]  The Expert Instructions directed that "The expert should list separate tasks separately. A rule of thumb is that every half hour should have a separate task, differentiated from other tasks."  Expert Instructions at 8.

To assist them in their claim, The Ennises retained three people: Thomas Cupps, Omid Akbari, and Nanette Silverberg.  Of this group, the reasonableness of costs associated with Dr. Cupps and Dr. Akbari remains unresolved.

Dr. Cupps was the first person whom the Ennises retained.  He graduated from medical school in 1975.[5]  He became board-certified in internal medicine in 1978 and in allergy and immunology in 1982.  Beginning in 1983, Dr. Cupps taught within the division of rheumatology, immunology, and allergy at Georgetown University Medical Center.  Dr. Cupps held different positions, achieving a full professorship in 2014.  He lists four areas of interest for his research: (1) "evaluating the basic immunopathologic mechanisms" for "Wegener's granulomatosis, systemic necrotizing vasculitis, [and] immune-mediated tissue injury of the [the] skin and subcutaneous tissues," (2) "central nervous system immune mediated injury including CNS vasculitis," (3) "sensory hearing loss," and (4) "Management of immunosuppressive agents."  He also practiced medicine in the same location.

His curriculum vitae lists 86 articles published in peer-reviewed journals with an additional 40 abstracts.  The most recent article was published in 2012, which was approximately five years before Dr. Cupps wrote a report for this litigation.  Within Dr. Cupps's list of articles, no articles contain the term "psoriasis" in their titles.  Two articles (#33 from 1988 and #54 from 1991) are titled "Dermatomyositis and polymyositis."  Otherwise, no other articles contain the term "dermat-".  Dr. Cupps has several publications about the hepatitis B surface antigen, which is a component of the hepatitis B vaccine.  However, none of the articles have titles suggesting publication on autoimmune hepatitis.

Dr. Cupps wrote one report, which is Exhibit 34.  The substance of the report is found in approximately 23 single-spaced pages with an additional two pages for references.  Dr. Cupps began his report by setting forth his qualifications and identifying *some* of the materials he reviewed.  These two sections take two pages.  Although the Expert Instructions require experts to disclose "all" the material reviewed, Dr. Cupps did not disclose everything in his expert report that he listed on his invoice, which was provided much later.  In his invoice, Dr. Cupps charged time for "review of letter dated 10-17-17," and "review of counsel prepared time line."  In addition, although the Expert Instructions seek information about the expert's experience in treating patients with relevant diseases (here, psoriasis or autoimmune hepatitis) within the last five years (paragraph 1.c), Dr. Cupps did not provide any answer to this query.

---

[4] The portion of the expert instructions for preparing invoices was directed to experts retained by the petitioners only because only petitioners submit expert invoices to special masters.

[5] Information about Dr. Cupps's background is found in his curriculum vitae, which is Exhibit 35.

Over the next approximately 10 pages, Dr. Cupps brings forward events in B.E.'s medical history.  In the next approximately 3.5 pages, Dr. Cupps presents opinions that B.E. suffered psoriasis and autoimmune hepatitis.

The remaining portion (approximately eight pages) constitutes the crux of Dr. Cupps's opinion---how the vaccinations harmed B.E.  Dr. Cupps sets out some basic information about immunology and how the immune system responds to vaccinations.  Pages 16-19 are specifically about vaccines causing B.E.'s psoriasis.  Pages 19-23 are specifically about vaccines causing B.E.'s autoimmune hepatitis.

Through the Ennises' pending motion for attorneys' fees and costs, Dr. Cupps has invoiced for 68 hours of work at a rate of $650.00 per hour.  The total requested amount is $44,200.00.[6]

The Secretary responded to the opinions from Dr. Cupps with reports from three people. Each person whom the Secretary retained specialized in a different area of medicine: Andrew J. MacGinnitie is a pediatric immunologist, Markus Boos is a pediatric dermatologist, and Elizabeth B. Rand is a pediatric gastroenterologist with specialty in pediatric hepatology and transplantation.[7]

To introduce some context for the assessment of the quality of Dr. Cupps's work, the views of this group are summarized briefly.  Dr. MacGinnitie critiqued Dr. Cupps's use of immunology (specifically Th1 and Th2 cells).  Dr. MacGinnitie proposed that "an underlying immunodysregulatory disorder provides a more likely diagnosis unifying B.E.'s multiple medical issues."  Exhibit B at 17.  Dr. Boos opined that psoriasis was not likely to be an appropriate diagnosis for B.E.  Exhibit D at 21.  Dr. Boos proposed that B.E. suffered from a "psoriasis-atopic dermatitis overlap syndrome."  Id. at 24.  Also, Dr. Boos noted that regardless of diagnosis, B.E. had problems with her skin before vaccination, meaning the vaccination was not the cause of the skin problems.  Id. at 23.  Finally, Dr. Rand, the pediatric gastroenterologist, opined "the evidence supports the *absence* of a diagnosis of AIH [autoimmune hepatitis] to a strong degree of medical certainty."  Exhibit F at 7 (emphasis in original).

In an unrecorded May 23, 2018 status conference, the parties discussed the competing opinions.  The undersigned noted that the set of reports from the Secretary's experts were very

---

[6] Dr. Cupps's invoice is found at pages 73-75 of Exhibit 139.

[7] Ms. Wilson suggested that the Secretary greatly expanded the litigation by retaining three experts.  Remand Oral Arg. Tr. at 550.  This point is not accurate because Dr. Cupps opined on three different topics: immunology, dermatology, and gastroenterology.  Thus, the Secretary's response seems proportionate.  Moreover, the Secretary's retention of three experts does not affect the outcome of the motion for attorneys' fees and costs.  Nearly all the attorneys' fees were paid in the First Fees Decision.  The First Fees Decision reduced the compensation to Dr. Cupps, who wrote a report before the Secretary responded with three experts.  The First Fees Decision also reduced compensation to Dr. Akbari because Dr. Akbari invoiced at an unreasonably high rate.  The deductions for Dr. Cupps and Dr. Akbari are in no way related to the number of experts the Secretary retained.

strong, particularly in challenging the diagnosis of autoimmune hepatitis.  See Order, issued May 24, 2018.  When asked about autoimmune hepatitis in the status conference, Ms. Wilson stated that she had not read the expert report yet.  Later, on behalf of the Ennises, Ms. Wilson stated that Dr. Cupps would prepare a rebuttal report.  Pet'rs' Status Rep., filed June 20, 2018.  But, during an unrecorded July 3, 2018 status conference, Ms. Wilson stated that Dr. Cupps would not respond to the expert report from Dr. Rand.  This position was confirmed via a status report filed on August 31, 2018.

Without a supplemental report from Dr. Cupps, the criticisms of Dr. Cupps's opinion were not rebutted by Dr. Cupps.  Instead of obtaining a supplemental report from Dr. Cupps, the Ennises obtained reports from two other people, Omid Akbari and Nanette Silverberg.  These reports were filed in November 2018.

Dr. Silverberg is a pediatric dermatologist.  The substance of her report is 18 single-spaced pages with an additional seven pages for references.  She concluded that the "influenza and MMR vaccines administered to [B.E.] were plausibly substantial factors in the onset of her psoriasis." Exhibit 62 at 18.[8]  Dr. Silverberg mentioned immune-mediated hepatitis in a few sentences, but did not assert that the vaccines directly caused B.E. to suffer autoimmune hepatitis.

For her first report, Dr. Silverberg invoiced 31 hours at an hourly charge of $500 per hour.  The total requested for Dr. Silverberg was $15,500.00.  Exhibit 139 at 118.  This amount was found to be reasonable, and the costs associated with Dr. Silverberg are not disputed.

The third person whom the Ennises retained is Omid Akbari.  Dr. Akbari earned a Ph.D. in cellular and molecular immunology in 1998.[9]  His academic career began in 2001.  Since 2015, he has been a tenured professor of allergy and immunology in the department of molecular microbiology and immunology at the Keck School of Medicine, University of Southern California.  His curriculum vitae lists 70 articles published in peer-reviewed journals.

Dr. Akbari expressed his opinions through one report, filed as Exhibit 64.  The report is 11 single-spaced pages with another page for references.  Although the report is not structured as recommended in the Expert Instructions, some of the requested information is presented.  Over the course of about two pages, Dr. Akbari explains his qualifications, highlighting his experience with psoriasis.  Dr. Akbari does not discuss autoimmune hepatitis.  His report omits any discussion of events in B.E.'s life.  For example, Dr. Akbari does not cite any of her medical records by exhibit number and page number.  Instead, the bulk of his report is devoted to explaining the causes of psoriasis and why vaccines can cause psoriasis.

---

[8] Because the cost for Dr. Silverberg's report is not at issue, the details of her opinions are not set out.

[9] Information about Dr. Akbari's background comes from his curriculum vitae, which is Exhibit 65.

The Secretary obtained responses from the three people whom he had previously retained. Exhibits I, J, and L. The Ennises filed a supplemental report from Dr. Silverberg. Exhibit 109.

In the ensuing status conference, the Secretary requested an opportunity to obtain more reports from experts. In this conference, Ms. Wilson disclosed that B.E. was no longer receiving medical care for the injuries allegedly caused by the vaccinations. Because B.E.'s injuries were relatively defined, the case could be appropriate for an informal resolution. Although Ms. Hartley did not reject the possibility of exploring settlement, Ms. Hartley advised that the claim regarding autoimmune hepatitis could be an obstacle. Ms. Hartley stated that she would confer with her client. After consultations, the Secretary did not want to explore settlement. Resp't's Status Rep., filed July 16, 2020.

With the possibility of a settlement removed from consideration, the parties were directed to advocate through briefs. Order, issued Oct. 13, 2020. One purpose of the order for briefs was to have the parties update their evidence. For example, the order required the parties to submit a current curriculum vitae and a statement from each testifying expert that they were not aware of any newly published articles.

The Ennises submitted a brief on March 15, 2021. The brief, however, was not a model of clarity. The brief cited Dr. Akbari's opinions to explain how the Ennises' evidence supporting a finding that the vaccines can cause psoriasis. See Pet'rs' Br., filed Mar. 15, 2021, at 39-48. However, the Ennises did not list Dr. Akbari as one of their witnesses. See id. at 62. The Ennises were instructed to clarify their position. Order, issued Mar. 17, 2021.

The Ennises stated that they were relying upon the reports from Dr. Cupps and Dr. Akbari. They did not anticipate calling them as witnesses. Pet'rs' Status Rep., filed Apr. 1, 2021. In an unrecorded April 16, 2021 status conference, Ms. Wilson stated that Dr. Akbari was not attending the trial. Ms. Wilson further maintained that Dr. Akbari was not necessary for the case as the Ennises could prevail based upon the opinions from Dr. Silverberg. The basis for Dr. Akbari's non-participation has not been explained.

The Ennises supplemented their brief. Pet'rs' Br., filed June 3, 2021. The Secretary responded. Resp't's Br., filed Sep. 29, 2021. The Ennises had the final word. Pet'rs' Reply, filed Nov. 16, 2021.

Efforts to schedule a hearing were started. The Ennises stated that Dr. Akbari and Dr. Cupps would not testify. Pet'rs' Status Rep., filed Nov. 23, 2022. A hearing was eventually scheduled to start on December 4, 2023. Order, issued Dec. 12, 2022.

As the parties prepared for the hearing, the Secretary maintained that he was not interested in settlement and that he intended to proceed with the litigation. Resp't's Status Rep., filed June 27, 2023. Then, five days before the hearing was anticipated to begin, perhaps after weighing the costs of going to trial, the parties reached a tentative settlement agreement. Thus, the hearing was cancelled. Order, issued Nov. 30, 2023.

Due, in part, to complications involving identifying the Medicaid lien and (separately) the health of Ms. Ennis, the process of confirming the tentative agreement was prolonged. On

6

December 12, 2024, the parties filed a joint stipulation, which the undersigned adopted as a decision on December 13, 2024.  2024 WL 5320027.

### B.      Attorneys' Fees and Costs at the Office of Special Masters

On January 22, 2025, the Ennises filed a motion for attorneys' fees and costs.  The Ennises requested attorneys' fees and costs that total $315,214.40.  The Ennises' motion is five pages in length.  It was accompanied by eight exhibits.  Exhibits 137-44.  The exhibits do not include affidavits from any of the experts attesting to the reasonableness of their proposed rates. Cf. Raney v. Fed. Bureau of Prisons, 222 F.3d 927, 938 (Fed. Cir. 2000) (en banc) ("in future cases, the trial court should demand adequate proof from individuals familiar with the market of the community billing rate charged by attorneys of equivalent skill and experience performing services of similar complexity").

The Secretary deferred to the undersigned's assessment, submitting his generic response. Resp't's Resp., filed Feb. 1, 2025.  The Ennises did not file a reply thereafter.

The Ennises were awarded their reasonable attorneys' fees and costs.  First Fees Decision, issued July 15, 2025.  For the attorneys' fees, nearly all activities were found to be reasonable.  For the attorneys' costs, reductions were made for Dr. Cupps's hourly rate, Dr. Cupps's number of hours, and Dr. Akbari's hourly rate.  2025 WL 2239245.

### C.      Motion for Review at the Court of Federal Claims

The Ennises filed a motion for review of the fees decision.  Regarding Dr. Cupps, the Ennises argued that it was unreasonable to reduce Dr. Cupps's twice (i.e., reducing both the hourly rate and the number of hours) for the same reason (poor performance).  Pet'rs' Mot., filed Aug. 14, 2025 at 7-9.  Petitioners further maintained that Dr. Cupps's requested rate was justified under the Frantz factors, and that it was unreasonable to reduce it to $300 without "specific supporting justification." Id. at 9-13.[10]  The Ennises also defended the hours expended.  Id. at 13-16.  As to Dr. Akbari, the Ennises again invoked the Frantz factors and argued that it was unreasonable to reduce his rate for not holding a medical degree.  Id. at 16-20.

The Secretary responded, arguing that the fees decision was not arbitrary or capricious. The Secretary contended that Dr Cupps's rate was not reduced twice for poor performance; rather, his hourly rate was reduced for poor performance, and his hours were reduced as being excessive.  Resp't's Resp., filed Sept. 14, 2025, at 6.  Next, the Secretary noted that Frantz is not binding, and argued that the Ennises' application of the factors was an attempt to reweigh the evidence.  Id. at 7-8.  Finally, the Secretary argued that it was within the special master's discretion to reduce Dr. Akbari's rate, and cited to Lewis v. Sec'y of Health & Hum. Servs., 149 Fed. Cl. 308 (2020), in which the decision to reduce Dr. Akbari's rate for the same reason was sustained.  Id. at 8-9.

The Court held an oral argument via videoconferencing on October 14, 2025.  Ct. Oral Arg. Tr. 1-49.  At the end, the Court suggested that a compromise might be appropriate.

---

[10] The Ennises relied on the factors used in Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137 (2019).  These are discussed in more detail in the following sections.

However, the Secretary declined to participate in any discussions.  See Jt. Status Rep., filed Dec. 15, 2025.

The Court convened another proceeding, recorded by a court reporter, on January 13, 2026.  The Court delivered a bench ruling granting the motion for review.  Bench Ruling Tr. 1-33, filed Jan. 29, 2026.[11]  The Court again suggested an informal resolution was advisable.  Bench Ruling Tr. at 30-31.  In remanding the case, the Court directed the undersigned to consider whether to allow the Ennises to file a motion for supplemental fees.

### D.    Attorneys' Costs on Remand at the Office of Special Masters

The Ennises' motion for leave to file supplemental fees was granted.  Order, issued Jan. 30, 2026.  This order also directed the Secretary to respond to the Court's suggestion that an informal resolution is appropriate, directed the Secretary to respond to the request for supplemental fees, and scheduled an oral argument.

The Secretary, again, declined to explore an informal resolution.  Resp't's Status Rep., filed Feb. 13, 2026.  The Secretary also generally deferred to the special master's discretion regarding the supplemental fees, although the Secretary noted that spending more than 100 hours on a motion for review appeared excessive.  Resp't's Resp., filed Feb. 13, 2026.

An oral argument was held on March 4, 2026.  The proceeding with digitally recorded.  Due to a problem with the audio file, the official transcript was not obtained until April 7, 2026.

### II.    Standards for Adjudication

Because the Ennises received compensation, they are entitled to an award of reasonable attorneys' costs.  42 U.S.C. § 300aa–15(e).  Thus, the question at bar is whether the requested amount is reasonable.  For attorneys' fees, the Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  This is a two-step process.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.  The lodestar method is also used to determine reasonable compensation for experts.  Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).

For an expert's hourly rate, special masters may consider a variety of factors.  These include:

> (1) [T]he witness' area of expertise; (2) the education and training
> required to provide the expert insight that is sought; (3) the
> prevailing rates for other comparably respected available experts;

---

[11] Although the Court's second proceeding occurred on January 13, 2026, the transcript, which contained the Court's reasoning, was not filed until approximately two weeks later on January 29, 2026.

(4) the nature, quality and complexity of the [information] provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the [Special Master] in balancing the interests implicated by the [Vaccine Act].

Frantz, 146 Fed. Cl. at 145.[12]

Any request for a reasonable number of hours should not include hours that are excessive, redundant, or otherwise unnecessary.  See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (discussing request for attorneys' fees).

In attempting to determine a reasonable amount of attorneys' fees and costs, trial courts should attempt to achieve the "essential goal" of "rough justice."  Fox v. Vice, 563 U.S. 826, 838 (2011).  In doing so, trial courts must take care to balance competing interests, one in which the amount of attorneys' fees and costs encourages participation in litigation yet the amount does not create a windfall.  Blum v. Stenson, 465 U.S. 886 (1984); Biery v. United States, 818 F.3d 704, 710 (Fed. Cir. 2016).

Awards of attorneys' fees and costs are based upon the reasonableness of the expense when the activity is performed, not when it is paid.  Awards that account for delay in payment, such as awards of interest, violate sovereign immunity.  Avera v. Sec'y of Health & Hum. Servs., 75 Fed. Cl. 400, 405 (2007), aff'd in part and rev'd in part on non-related grounds, 515 F.3d 1343 (Fed. Cir. 2008); Pestka v. Sec'y of Health & Hum. Servs., No. 06-708, 2011 WL 4433634, at *5 (Fed. Cl. Spec. Mstr. Aug. 30, 2011).

## III.   Analysis

The analysis of a reasonable amount of compensation for the two experts, Dr. Cupps and Dr. Akbari, starts with Dr. Cupps.  For Dr. Cupps, both a reasonable number of hours and a reasonable hourly rate are evaluated.  For Dr. Akbari, the issue is a reasonable hourly rate.

### A.   Thomas Cupps

In Dr. Cupps's report, he proposed that B.E. suffered from psoriasis and autoimmune hepatitis and that the vaccines caused those conditions.  Exhibit 34.  He has charged 68 hours of work at the rate of $650.00 per hour.  Dr. Cupps's invoice totals $44,200.00.  Exhibit 139 at 73-75.  A reassessment of both the number of hours and the hourly rate is required.

#### 1.   Reasonable Number of Hours

The First Fee Decision found that Dr. Cupps spent an excessive number of hours.  In an attempt to accomplish "rough justice," the First Fee Decision compared the time Dr. Cupps spent to the time that the Ennises' other two experts spent.  Because Dr. Cupps's charged time greatly exceeded the time spent by other experts on their first reports, Dr. Cupps's time was reduced to

---

[12] Although the parties refer to these as the Frantz factors, use of these factors predates the Frantz case.  See Frantz, 146 Fed. Cl. at 145 (citing Wilcox v. Sec'y of Dep't of Health & Hum. Servs., No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997)).

34 hours, which was close to (but slightly higher than) the amount of time spent by the other experts on their first reports.  2025 WL 2239245, at *3.  In the bench ruling, Judge Hertling stated: "Comparison of the amount of time Dr. Cupps expended to the time expended by the other two experts can be useful and may even be determinative, but not without explanation specific to the facts of this case."  Bench Ruling Tr. at 24.

The report from the Ennises' dermatology expert, Dr. Silverberg, can be a "useful" and potentially "determinative" metric in assessing the time that Dr. Cupps claimed to have spent.  Bench Ruling Tr. at 24.  Like Dr. Cupps, Dr. Silverberg reviewed "all office notes."  Exhibit 62 at 2.  Like Dr. Cupps, Dr. Silverberg searched for medical literature on several topics related to vaccines causing psoriasis.  But unlike Dr. Cupps, Dr. Silverberg also reviewed Dr. Cupps's report and the report from the Secretary's expert in dermatology, Dr. Boos.  Thus, contrary to Ms. Wilson's suggestion at oral argument, the record of material had not narrowed.  Remand Oral Arg. Tr. at 605.  Based upon the similarity in scope of materials reviewed, the time spent reviewing the material should be roughly similar.

The result of the review of material is also relatively the same.  Dr. Cupps's report is 23 single-spaced pages with two pages for 25 medical articles.  Dr. Silverberg's report is 18 single-spaced pages with seven pages for 44 medical articles of which some were summarized.

Although the input (material reviewed) and the output (report) were relatively similar, the number of hours charged was highly disparate.  Dr. Cupps charged 68 hours and Dr. Silverberg charged 31 hours.  It is important to note that the difference was not a slight difference.  Dr. Cupps billed *more than twice* as much as Dr. Silverberg.  In the undersigned's experience, the amount of time that Dr. Silverberg spent is far more common for reports in the Vaccine Program.

Upon remand, Dr. Cupps's invoice was again reviewed, but this time more thoroughly.  The basis for the extra time is not readily apparent from Dr. Cupps's invoice.

A significant problem with Dr. Cupps's invoice is that he did not follow the Expert Instructions.  Experts are required to list their activities with sufficient detail that they can be assessed.  See Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 781-83 (2013); Morse v. Sec'y of Health & Human Servs., 89 Fed. Cl. 683 (2009).  Dr. Cupps was informed of this minimum expectation.  The Expert Instructions stated: "The expert should list separate tasks separately. A rule of thumb is that every half hour should have a separate task, differentiated from other tasks."  The Expert Instructions are also intended to prevent a problem in which experts do not know how to create useful invoices.  See Remand Oral Arg. Tr. at 544 (Ms. Wilson expressing concern that experts, unlike attorneys, may not know how to bill).  Here, Dr. Cupps acknowledged receipt of the Expert Instructions.  See Cupps Invoice entries for 10-26-17 and 10-31-2017.

Despite the Expert Instructions, Dr. Cupps did not break out activities into increments of approximately 30 minutes.  He created 20 time entries.  Of these 20, the smallest entry is 1.5 hours.  Two contain 6 hours.  The mean entry is 3.6 hours and the mode is 4.5 hours.  Based upon a review of Dr. Cupps's invoice, the undersigned disagrees with Ms. Wilson's assertion that "much of [Dr. Cupps's] invoice is clearly detailed."  Remand Oral Arg. Tr. at 603.

The way that Dr. Cupps created his invoice interferes with assessing the reasonableness of his activities.  For example, his second entry for 2.5 hours (or 150 minutes) consists of "Review of Petition for Compensation on Behalf of a minor, generation of work review record, conference call with Dr. Wilson, initial review of counsel prepared [timeline]."  These are four discrete tasks that should have been billed separately.  The September 15, 2016 petition is essentially five double-spaced pages with a sixth page for a signature block and a certificate of service.  It seems that this petition can be read in less than five minutes, but to be generous, 0.2 hours are assigned.  The generation of a work review record should have taken 0.1 hours.  The call with Attorney Amber Wilson is not included within the attorneys' timesheets.  See Exhibit 138 (first entry on Jan. 2, 2018).[13]  For sake of discussion, this can be assumed to have been 0.5 hours, which is a relatively long amount of time for a doctor to speak with an attorney.  Thus, the first three items appear to have taken 0.8 hours (0.2 + 0.1 + 0.5), leaving 1.7 hours for an initial review of a timeline that the attorney prepared.  Because Dr. Cupps did not disclose that he had reviewed the attorney's timeline, the attorney's timeline is not in the record.  Without knowing anything about the attorney's timeline, how can the undersigned assess the reasonableness of spending approximately 102 minutes on an initial review?

Another example of the problems in assessing Dr. Cupps's invoice concerns his review of medical records to prepare a chronology of events in B.E.'s life.  Not including the time spent on reviewing the attorney's timeline, Dr. Cupps reviewed B.E.'s medical records and/or wrote his chronology of specific events on seven dates (Oct. 29, 2017; Oct. 30, 2017; Nov. 2, 2017; Nov. 4, 2017; Nov. 5, 2017; Nov. 6, 2017; Nov. 9, 2017).  The multiplicity of dates is not a problem.  The problem is that many of the day's entries blend different tasks, which the Expert Instructions counsel against.  See Expert Instructions at 8 ("The more significant issues regarding invoices are: what is being done and how long the task takes.  The expert should list separate tasks separately.  A rule of thumb is that every half hour should have a separate task, differentiated from other tasks.").  For example, the November 6, 2017 entry is: "Continued work on case clinical chronology with continued detailed review of exhibit 11, review of UpToDate encephalomyelitis, Pubmed search on post-vaccination encephalomyelitis."  Despite Dr. Cupps's lack of specificity, an estimate of the amount of time spent on the task of reviewing B.E.'s medical records and writing the associated chronology is about 21 hours.  By way of contrast, Dr. Silverberg spent 4 hours on reading the records and another 5 hours in writing the entire first draft of her report.  The summaries of medical records written by Dr. Cupps and Dr. Silverberg are relatively similar.

Other examples of poorly explained and/or excessive billing are found in the final three entries on Dr. Cupps's invoice.  In the third to last entry, Dr. Cupps charged 3.0 hours for "Proof reading and correcting the initial draft expert report [and] communication with counsel."  The attorneys' invoice does not include time spent speaking with Dr. Cupps.  See footnote 13, above.

---

[13] In a different case, an attorney at Maglio law firm represented that some time records had been moved a different server and obtaining those time records is expensive and time consuming.  In noting that the time sheets do not contain information about a discussion between Attorney Wilson and Dr. Cupps, the undersigned is not suggesting that a conversation did not take place.  The lack of information from the attorneys' timesheet is relevant because it could have served as a way to understand the amount of time that Dr. Cupps spent speaking with Attorney Wilson.

Again, it is estimated that Dr. Cupps spent 0.5 hours speaking with Attorney Wilson. If so, then Dr. Cupps spent 2.5 hours proofreading and correcting his draft report. In the undersigned's experience, experts do not charge this much time, and many experts do not charge for this task at all. Dr. Cupps continued to charge for revising his report. In the second to last entry, Dr. Cupps charged 2.75 hours for "Correcting and typing references and placing reference numbers in the body of the report." Finally, on December 18, 2017, Dr. Cupps spent 1.75 hours on "Communication with counsel, preparation and printing of the final draft, generation and organization of available references, provide a copy updated CV, prepare and send submission package to counsel."

So, collectively, Dr. Cupps spent 7.5 hours on, essentially, communicating with Attorney Wilson, revising a draft report, and editing his report. By way of contrast, Dr. Silverberg's final two entries, which include tasks for reviewing, responding to questions and comments, proofreading and printing total 4.0 hours. Dr. Akbari's final two entries, which include communicating with Attorney Wilson, reviewing the report, reviewing literature, and reviewing the final report, total 3.5 hours.

Overall, the impression is that Dr. Cupps spent an excessive amount of time. The Expert Instructions directed Dr. Cupps to divide tasks into blocks of approximately 30 minutes and Dr. Cupps failed to follow these instructions. If Dr. Cupps had divided his time into more easily understood activities, then perhaps an assessment of the reasonableness of his activities might be different. But, Dr. Cupps's invoice generally frustrates a more detailed assessment. See Remand Oral Arg. Tr. at 576-77 (Ms. Wilson: "it might also be that petitioners' attorneys need to work a little bit better with the experts in making their invoices . . . a little more detailed"). To the extent that details are gleanable, they show that Dr. Cupps billed about twice as much time as the other experts. Under these circumstances, the undersigned again finds that a reasonable amount of time for Dr. Cupps's work is 34 hours.

### 2.    Reasonable Hourly Rate

In their January 22, 2025 motion, the Ennises requested that Dr. Cupps be compensated at a rate of $650.00 per hour, citing one case. The motion did not discuss the Frantz factors. The motion did not include evidence about Dr. Cupps's usual hourly rate, such as an affidavit from him. The First Fees Decision declined to accept that proposal because the cited case, Gomes v. Sec'y of Health & Hum. Servs., No. 13-375V, 2015 WL 4722652 (Fed. Cl. Spec. Mstr. July 20, 2015), contains no analysis of Dr. Cupps's hourly rate, and because Dr. Cupps's performance was poor. Thus, Dr. Cupps was compensated at a rate of $300.00 per hour.

The Ennises challenged this finding. Pet'rs' Mot. For Rev. at 9-13. In oral argument, Judge Hertling stated that there was not sufficient explanation. Ct. Oral Arg. Tr. at 34-35. The bench ruling was consistent in that Judge Hertling stated that further analysis of "Dr. Cupps' academic credentials, experience or specific performance issues in this matter" would be appropriate. If so, then the hourly rate of $300 per hour might be "reasonable and supportable." Bench Ruling Tr. at 25.

> a)      *First Two Factors: Area Of Expertise And The Education And Training*

Dr. Cupps graduated from medical school in 1975, became board-certified in internal medicine in 1978, and became board-certified in allergy and immunology in 1982.  Exhibit 35 (curriculum vitae) at 1.  His education and training were primarily done in the late 1970's and early 1980's, although Dr. Cupps undoubtedly continued to learn as a practicing doctor throughout his career, which lasted at least four decades.  He has worked within the division of rheumatology, immunology and allergy at Georgetown University Medical Center.  Id. at 2.

> b)      *The Prevailing Rates For Other Comparably Respected Available Experts*

The Ennises' January 25, 2025 motion for fees provided no support for the rate that Dr. Cupps requested, $650 per hour.  The motion cited a single case.  But, the published opinion does not show that Dr. Cupps was compensated at this rate, nor does it contain any analysis as the award was based on a stipulation.  Gomes v. Sec'y of Health & Hum. Servs., No. 13-375V, 2015 WL 4722652 (Fed. Cl. July 20, 2015); see also Remand Oral Arg. Tr. at 572 (Ms. Wilson: "I don't know if the decision gave enough of an analysis . . . I think some of the subsequent case law has determined that there might need to be additional reasoning added by a Special Master for that particular case and that particular individual . . . If there was reasoning there, I think that you could adopt it.").

With respect to "other comparably respected experts," the parties provided no examples.  See Pet'rs' Mot., filed Jan. 22, 2025.[14]  Nevertheless, Judge Hertling recommended a "comparison with the hourly rates of other experts in the field."  Bench Ruling Tr. 25.

In an opinion issued in 2017, which is the year Dr. Cupps wrote his report, a special master declined to increase the hourly rate for Dr. Steinman from $500 per hour to $550 per hour.  The special master commented "in the Vaccine Program, even the payment of $500.00 per hour is rare."  Rosof v. Sec'y of Health & Hum. Servs., No. 14-766V, 2017 WL 1649802, at *4 (Fed. Cl. Spec. Mstr. Mar. 31, 2017).  Similarly, this special master also commented that the rate of $400.00 per hour is reserved for "highly-credentialed, experienced, and competent Vaccine Act expert witnesses."  Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2017 WL 6763067, at *8 (Fed. Cl. Spec. Mstr. Dec. 5, 2017).  Rosof and Prokopeas show that in 2017, neither the Ennises nor Dr. Cupps should have expected that Dr. Cupps would be reimbursed at $650.00 an amount that is roughly *one-third more* than a rarely awarded top hourly rate, $500.00.  Instead, it appears that $650.00 per hour serves as an anchor in the Ennises's eyes, which leads to an impression that reductions are severe.  See Dan Orr and Chris Guthrie, Anchoring, Information, Expertise, And Negotiation: New Insights From Meta-Analysis, 21 Ohio St. J. on Disp. Resol. 597 (2006).

As discussed later in the context of Dr. Akbari, another expert who participates frequently in the Vaccine Program, Dr. Gershwin, can serve as one adequate comparator for

---

[14] To the extent that a relevant metric is the degree to which an expert is "respected," this factor is difficult to assess in the sense that Dr. Cupps does not have a meaningful track record at the Office of Special Master such that he is neither esteemed nor disdained.

medical doctors with board-certifications in immunology.  In fees decisions issued around the time that Dr. Cupps wrote his report, Dr. Gershwin's hourly rate was found to be $500.00.

A better comparator might be Joseph Bellanti.  Dr. Bellanti worked at Georgetown as a medical doctor who is board-certified in immunology.  Locane v. Sec'y of Health & Hum. Servs., 99 Fed. Cl. 715, 720 (2011), aff'd on non-related grounds, 685 F.3d 1375 (Fed. Cir. 2012).  Thus, Dr. Bellanti and Dr. Cupps share an employer as well as a profession and specialty.[15]

Dr. Bellanti's hourly rate is much lower than the hourly rate Dr. Cupps has requested.  For work that Dr. Bellanti performed in 2017, one special master found that a reasonable hourly rate was $500.00.  Miles v. Sec'y of Health & Hum. Servs., No. 12-254V, 2018 WL 4704473, at *4 (Fed. Cl. Spec. Mstr. Sep. 7, 2018).  This rate of $500.00 per hour was used to compensate Dr. Bellanti for work apparently performed in either 2014 or 2015.  However, in subsequent years, Dr. Bellanti's hourly rate was also lower.  See Estate of Biondi v. Sec'y of Health & Hum. Servs., No. 12-476V, 2017 WL 1046526, *4 (Fed. Cl. Spec. Mstr. Feb. 23, 2017) (awarding Dr. Bellanti $400.00 per hour); Miles v. Sec'y of Health & Hum. Servs., No. 12-254V, 2017 WL 4875816, at *4 (Fed. Cl. Spec. Mstr. Oct. 4, 2017) (decision awarding attorneys' fees and costs on an interim basis) (awarding Dr. Bellanti $400.00 per hour for work performed in 2014); Grant v. Sec'y of Health & Hum. Servs., No. 17-1816V, 2019 WL 6588294 (Fed. Cl. Spec. Mstr. Oct. 29, 2019) (noting at *4 that special master directed petitioner to get an expert report in 2018 and finding at *9 that a reasonable hourly rate is $400.00).  In one case, Dr. Bellanti's hourly rate was reduced for poor performance.  Prokopeas, 2017 WL 6763067, at *9 (reducing Dr. Bellanti's hourly rate to $300.00 per hour).

Based upon these comparators, a reasonable hourly rate for Dr. Cupps in 2017 could be no higher than $500.00 per hour.  A more appropriate base rate for Dr. Cupps in 2017 is $400.00 per hour.  As this is a base rate, additional factors may still affect the final rate.

> c)      The Nature, Quality and Complexity of the Information Provided

Broadly speaking, Dr. Cupps presented two main opinions: (1) that B.E. suffered from psoriasis and that the vaccines caused her to suffer psoriasis and (2) that B.E. suffered from autoimmune hepatitis and the vaccines caused her to suffer autoimmune hepatitis.  Regarding the first topic (psoriasis), Dr. Cupps's opinion was within a broad category of average.  The Secretary challenged Dr. Cupps's opinion by presenting reports from Dr. Boos and Dr. MacGinnitie.  Dr. Boos maintained that a more appropriate diagnosis for B.E. was "psoriasis-atopic dermatitis overlap syndrome."  Exhibit D at 24.  Dr. Boos also challenged the claim that the vaccines caused B.E.'s dermatologic condition by noting that she had rashes before the

---

[15] Arguably, the comparison to Dr. Gershwin and Dr. Bellanti benefits Dr. Cupps unjustifiably.  Dr. Cupps has little to no experience in assisting parties as an expert in the Vaccine Program.  In contrast, Dr. Gershwin and Dr. Bellanti have extensive experience as expert witnesses.  But, the difference in experience is not being held against Dr. Cupps.  See Lewis, 149 Fed. Cl. at 318-19 (holding that special masters should not penalize an expert for a lack of experience).

vaccination.  Id. at 23.  Dr. MacGinnitie disputed the pathologic mechanism that Dr. Cupps proposed.  Exhibit B.

On the topic of vaccine-caused psoriasis, there is a legitimate dispute among the experts.  This type of good faith dispute would not normally raise a concern about the quality of the report from an expert.

However, the analysis changes for the second topic, autoimmune hepatitis.  Dr. Cupps diagnosed B.E. as suffering from autoimmune hepatitis primarily because of elevated transaminases.  Exhibit 34 at 13.  He also followed a simplified scoring system, under which a score of 6 points is required for a probable diagnosis of autoimmune hepatitis.  Id. at 14.  Dr. Cupps assigned B.E. 5 points and, therefore, concluded that she developed "immune mediated hepatitis."  Id. at 14-15.  Dr. Cupps did not explain why a score of 5 points justified the diagnosis when 6 points are required.

The Secretary contested Dr. Cupps's opinion by retaining a pediatric gastroenterologist, Dr. Rand.  In the five years preceding Dr. Rand's first report, she had treated more than one hundred children with autoimmune hepatitis.  Exhibit F at 1.  Dr. Rand explained, in great detail, why the "the evidence supports the absence of a diagnosis of AIH [autoimmune hepatitis] to a strong degree of medical certainty."  Id. at 7.  For example, Dr. Rand noted that although some of B.E.'s liver tests were elevated, they later returned to normal.  Id. at 4-5.  Dr. Rand explained that "Temporary liver enzyme elevations are very common in children and be the result of a wide range of causes."  Id. at 8.  She asserted "none of the expected autoimmune liver antibodies are positive."  Id. at 5.  When three pathologists reviewed B.E.'s liver biopsy, none suggested that B.E. could be suffering from autoimmune hepatitis "most likely because the findings described are so completely devoid of any of the usual features of AIH."  Id.  Dr. Rand also explained how Dr. Cupps erred in scoring B.E.'s presentation and said that B.E. actually scored a 3, not a 5.  Id. at 6-7.  Finally, Dr. Rand noted that autoimmune hepatitis is "a life-long disorder which requires treatment to prevent inevitable progression," but B.E. has received no treatment for an autoimmune disorder.  Id. at 7.

The strength of Dr. Rand's opinion that B.E. did not suffer from autoimmune hepatitis was readily apparent.  In the May 23, 2018 status conference, the undersigned commented that the Secretary's experts were strong, especially on the lack of support for the diagnosis of autoimmune hepatitis.  See Order, issued May 24, 2018; see also Remand Oral Arg. Tr. at 579-82 (discussion between Ms. Wilson and the undersigned as to whether Ms. Wilson should have anticipated that Dr. Cupps's performance was poor).  In this status conference, Attorney Wilson surprisingly stated that she had not yet reviewed the reports of the Secretary's experts.

Unlike the situation regarding vaccine-caused psoriasis, there appears to be no legitimate basis for Dr. Cupps's opinion that B.E. suffered from autoimmune hepatitis.  Dr. Cupps's opinion on this point was among the least credible opinions the undersigned has reviewed in any case.  While Dr. Cupps may be a good immunologist, his willingness to express an opinion regarding autoimmune hepatitis that was so thoroughly rebutted calls into question his credibility as an expert witness.  Dr. Cupps's lack of credibility was so great that it raised some skepticism about Dr. Cupps's opinions on psoriasis.

The Ennises' actions during litigation seem inconsistent with the idea that Dr. Cupps was such an excellent expert that he merits compensation at a rate of $650.00 per hour.  After the Secretary contested Dr. Cupps's opinions, the Ennises did not respond with a supplemental report from Dr. Cupps in which Dr. Cupps defended his opinion as was expected.  See Pet'rs' Status Rep., filed Aug. 31, 2018; see also Remand Oral Arg. Tr. at 584 (Ms. Wilson describing a shift in petitioner's litigation).  Instead, the Ennises pivoted to different experts, Dr. Silverberg and Dr. Akbari.  Similarly, the Ennises did not intend to call Dr. Cupps at the hearing to determine whether they were entitled to compensation.  Pet'rs' Status Rep., filed Apr. 1, 2021.

The Frantz factors incorporate an assessment of the quality of the expert's report.  Cases have recognized that poor performance may justify a reduction in an expert's proposed hourly rate.  Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137, 146 (2019); Murray v. Sec'y of Health & Hum. Servs., No. 19-1976V, 2023 WL 9503422, at *2-3 (Fed. Cl. Spec. Mstr. Dec. 22, 2023) (reducing expert's rate from $500 per hour to $100 per hour).  Judge Hertling appeared to accept the proposition that a deficiency in quality can justify a decrease in an expert's compensation.  Ct. Oral Arg. Tr. at 30-31; see also Remand Oral Arg. Tr. at 567 (Ms. Hanson: "The Government would also point out that Judge Hertling did not seem to take any issue with performance being applied to a rate").

### d)      Cost of Living

Dr. Cupps and Dr. Bellanti both worked at Georgetown University.  Thus, using Dr. Bellanti as a prime comparator for Dr. Cupps is reasonable, especially given that the Ennises have not made an argument about the cost of living.

### e)      Any Other Factor

During oral argument, Judge Hertling asked whether the law firm had already paid Dr. Akbari and Dr. Cupps.  Ct. Oral Arg. Tr. at 17.  Ms. Maglio stated that the law firm had.  Id.[16]; see also Remand Oral Arg. Tr. at 536.  Judge Hertling expressed concern that a reduction in Dr. Akbari's and Dr. Cupps's reimbursement would be money taken out of the law firm's pockets.

The payment of costs is not one of the delineated Frantz factors, as Ms. Wilson recognized.  Remand Oral Arg. Tr. at 561. Venerable precedent shows that the payment of costs does not make those costs reasonable.

---

[16] A law firm's prompt payment of experts may be typical but not universal in the Vaccine Program.  Some experts are willing to delay their payment until there is an award of attorneys' fees and costs.  For example, as noted in section III.B.1 below, Dr. Gershwin in A.A. by Akers was willing to accept a lower hourly rate for prompt payment, which suggests that Dr. Gershwin is sometimes paid later, albeit at a higher hourly rate.  Another example is Dr. Steinman, who often assists people claiming a vaccine caused them a neurologic problem.  In oral testimony, Dr. Steinman has often lamented that he is paid years after he writes reports.  Dr. Steinman probably half-jokingly has said he should create a list of all cases in which payment is owed for his heirs.  Notwithstanding these examples, the undersigned does not question Ms. Maglio's statement that her law firm paid Dr. Akbari and Dr. Cupps.

In one of the early appellate cases about attorneys' fees and costs in the Vaccine Program, a special master found that the petitioners' claim lost reasonable basis before the case went to a hearing and this finding meant that the petitioners could not be reimbursed for the costs of bringing their expert to the hearing. Perreira v. Sec'y of Health & Hum. Servs., No. 90-847V, 1992 WL 164436 (Cl. Ct. Spec. Mstr. June 12, 1992). The special master reasoned, in part, "an unreasonable expert fee is not converted into a reasonable fee simply because it was prepaid." Id. at *4.

The disappointed petitioners filed a motion for review, which the Court of Federal Claims denied. The Court stated: "Petitioners are not given a blank check to incur expenses without regard to the merits of their claim." Perreira v. Sec'y of Health & Hum. Servs., 27 Fed. Cl. 29, 34 (1992).

On appeal, in a precedential opinion, the Federal Circuit agreed with the determination that the petitioners had lost reasonable basis. Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375 (Fed. Cir. 1994). This outcome left in place the result that the petitioners were not reimbursed for all the costs they paid their expert.

Since Perreira, special masters have advised petitioners' attorneys that they must monitor costs of experts. King v. Sec'y of Health & Hum. Servs., No. 03-584V, 2010 WL 5470787, at *4 (Fed. Cl. Spec. Mstr. Dec. 13, 2010) (declining to award petitioners' steering committee approximately $500,000 for an article written to support the omnibus autism proceeding); see also Smith v. Sec'y of Health & Hum. Servs., No. 18-0043V, 2020 WL 1243238, at *3-5 (Fed. Cl. Spec. Mstr. Feb. 20, 2020) (declining to award travel costs and hours expended for unnecessary in-person conferral); Mostovoy v. Sec'y of Health & Hum. Servs., No. 02-10V, 2016 WL 720969, at *16 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (declining interim costs for expert whose invoice was not sufficiently detailed); Bartoszek v. Sec'y of Health & Hum. Servs., No. 17-1254V, 2024 WL 5200113, at *3 (Fed. Cl. Spec. Mstr. Nov. 26, 2024) (reducing experts' rates where experts' reports "did not meaningfully contribute to the resolution" of the case or were redundant). Thus, although the undersigned has considered the law firm's payment to the experts, this factor does not weigh heavily in favor of increasing compensation for Dr. Cupps.

### f)      Finding for Dr. Cupps's Hourly Rate

Based upon an analysis of the Frantz factors, a reasonable hourly rate for Dr. Cupps's work in this case is $300.00 per hour. See Buchman v. Sec'y of Health & Hum. Servs., No. 20-834V, 2023 WL 7220777, at *6 (Fed. Cl. Spec. Mstr. Oct. 11, 2023) (awarding an expert with a Ph.D. in immunology and a medical degree with a specialty in gastroenterology $300.00 per hour); Prokopeas, 2017 WL 6763067, at *9 (compensating Dr. Bellanti at $300.00 per hour when Dr. Bellanti's performance was poor). This finding is based, in part, on the poor quality of Dr. Cupps's opinion. It is certainly possible that if Dr. Cupps were to express opinions more credibly, then his hourly rate might increase.

### 3.      Lodestar Calculation for Dr. Cupps

The lodestar formula, which is used for both attorneys and experts, requires a finding of a reasonable number of hours and a reasonable hourly rate. A reasonable number of hours remains 34 hours. A reasonable hourly rate remains $300.00 hour. Thus, a reasonable amount of compensation, therefore, is $10,200.00 (34 * $300.00). This result is unchanged from the First

Fees Decision.  See Bench Ruling Tr. at 28 (noting an outcome on remand might be similar to the First Fees Decision).

### B.   Omid Akbari

Dr. Akbari opined that the vaccinations "could have been the environmental trigger necessary to induce expression of disease in a genetically susceptible child."  Exhibit 64 at 11.  The disease that Dr. Akbari discusses in his report is psoriasis.

For his report, he has charged 30.5 hours at a rate of $500 per hour.  His total request is $15,250.00.  Exhibit 139 at 131-32.

The Ennises supported Dr. Akbari's request by writing one paragraph in which they cited three cases.  Pet'rs' Mot., filed Jan. 22, 2025, at 3.  They cited: Robinson v. Sec'y of Health & Hum. Servs., No. 15-967V, 2018 WL 5629850 (Fed. Cl. Spec. Mstr. Sep. 12, 2018); Sewell v. Sec'y of Health & Hum. Servs., No. 12-124V, 2017 WL 6206208 (Fed. Cl. Spec. Mstr. Nov. 13, 2017); and Hernandez v. Sec'y of Health & Hum. Servs., No. 16-1508V, 2018 WL 4391060 (Fed. Cl. Spec. Mstr. Aug. 20, 2018).[17]

The First Fees Decision found that Dr. Akbari's proposed number of hours (30.5) was reasonable.  However, the First Fees Decision found that the proposed hourly rate was excessive because Dr. Akbari is not a medical doctor.  On this point, the First Fees Decision cited Lewis v. Sec'y of Health & Human Servs., No. 15-907V, 2020 WL 831998, at *7 (Fed. Cl. Spec. Mstr. Jan. 24, 2020), mot. for rev. denied in relevant part, 149 Fed. Cl. 308, 314-15 (2020).

The Ennises challenged this result.  They maintained that the First Fees Decision "sidesteps the Frantz factors for determining expert rates."  Pet'rs' Mot. for Rev., filed Aug. 14, 2025, at 16.  The Ennises proceeded to argue that there was sufficient information in the record for the special master to analyze the Frantz factors, despite the omission of any discussion of the Frantz factors in their underlying January 22, 2025 motion.  Cf. Remand Oral Arg. Tr. at 545 (Ms. Wilson: "petitioners' attorneys should be aware that they could file a memo stating . . . these are the Frantz factors").  The Ennises further argued that an automatic deduction for not being able to treat people is arbitrary.  Similarly, in oral argument, the Ennises faulted the First Fees Decision for not "discuss[ing] the market --- prevailing market rate for Dr. Akbari."  Ct. Oral Arg. Tr. at 12.  They made this argument without having presented any evidence about Dr. Akbari's market rate.  See Remand Oral Arg. Tr. at 589-93.

In response, the Secretary maintained that the First Fees Decision was not arbitrary.  The Court of Federal Claims had supported the same reasoning by denying a motion for review in Lewis.  Resp't's Resp., filed Sep. 14, 2025, at 8.

In oral argument, Judge Hertling stated: "I appreciate in the real world such scientists [ones with Ph.D.'s who conduct research] earn less than practicing physicians. . . . [Medical

---

[17] None of these three cases carry much persuasive value.  The earliest cited case, Hernandez, appears to assume mistakenly that Dr. Akbari is a "physician."  Robinson relies upon Hernandez without any separate analysis.  Finally, Sewell contains no discussion of Dr. Akbari's hourly rate.

doctors] probably earn more than Ph.D. researchers.  That fact alone may justify paying Ph.D.s less than practicing physicians." Ct. Oral Arg. Tr. at 36.  Although Judge Hertling suggested that the issue on which the expert was opining could influence the hourly rate of pay, Judge Hertling recognized that on remand, the special master "would probably reach the same conclusion." Id. at 37.

In Judge Hertling's bench ruling, Judge Hertling stated: "Beyond citing his five-year-old decision regarding Dr. Akbari, the special master drew no connection between the relevance of the absence of a medical license, Dr. Akbari's experience and expertise, and a reduction in his hourly rates." Bench Ruling at 27.  Thus, this matter was remanded.

There appears to be an expectation that Dr. Akbari's hourly rate must be determined anew.  So, the six factors from Frantz will be evaluated.

           1.        Reasonable Hourly Rate / Frantz Factors

                a)        *First Two Factors: Area Of Expertise and Education & Training*

The first two Frantz factors are foundational.  These factors are the area of expertise and the required training and education.  Here, Dr. Akbari's field of expertise is immunology and he has earned a Ph.D.  Exhibit 65; see also Pet'rs' Mot. for Rev. at 16-17 (relying upon Dr. Akbari's curriculum vitae for the first two Frantz factors).

Dr. Akbari's background is foundational in the sense that simply knowing that a person has earned a Ph.D. in immunology does not necessarily say anything persuasively meaningful about a reasonable hourly rate for a person with those qualifications.  Turning the qualifications into dollars and cents is reflected in the third Frantz factor, which concerns the "prevailing rates."  The Ennises rely upon previous decisions discussing Dr. Akbari's hourly rate.  As explained below, although these decisions are considered, they merit relatively little weight.

                b)        *The Prevailing Rates For Other Comparably Respected Available Experts*

By collective wisdom at least, people with a medical degree earn more money than people who work in a related field without a medical degree.  Judge Hertling declared: "scientists earn less than practicing physicians." Ct. Oral Arg. Tr. at 36.  Is this commonly held belief accurate?  And if so, how is the difference quantified?  The parties provided no information about the differences (or similarities) in earnings between people with medical degrees and people with Ph.D.'s but without a medical degree.  See Vaccine Rule 13(a)(1) ("Petitioner must include any and all materials necessary to substantiate the request"); see also Remand Oral Arg. Tr. at 593 (Ms. Hanson: the Government's position is that "this information would have been well put in the fee application").  Due to the lack of information from the parties responsive to Judge Hertling's point, further inquiry was made.

Information about the earnings of various professions is made available to the public through databases of the Department of Labor.  A judicial officer may take judicial notice of this information. Giles Indus., Inc. v. United States, 650 F.2d 274, 278 (Ct. Cl. 1981); Abbott on behalf of R.A. v. Sec'y of Health & Hum. Servs., No. 14-907V, 2020 WL 8766524, at *7 (Fed. Cl. Spec. Mstr. Dec. 4, 2020); Amer. Acad. of Pediatrics v. Kennedy, No. 25-11916, 2026 WL

733828, at *3 (D. Mass. Mar. 16, 2026) ("The Court may also take judicial notice of information on official government websites"). This government-collected information suggests that medical doctors earn *at least* 2.5 more per year than scientists.

One example of a medical doctor who practices immunology is M. Eric Gershwin. Dr. Gershwin is a useful comparator because of his long career as a practicing doctor, his location in California, his expertise in the field of immunology, and his experience as a doctor who participates in litigation frequently. In 2017 and 2018, special masters compensated Dr. Gershwin at a rate of $500.00. See, e.g., A.A. by Akers v. Sec'y of Health & Hum. Servs., No. 15-597, 2018 WL 3216243, at *5 (Fed. Cl. Spec. Mstr. May 31, 2018) (noting that Dr. Gershwin billed at an hourly rate of $500.00 per hour, but that he offered a discount for prompt payment); Hoskins v. Sec'y of Health & Hum. Servs., No. 15-071, 2017 WL 3379270, at *4 (Fed. Cl. Spec. Mstr. July 12, 2017); Rosof, 2017 WL 1649802, at *4. Although these cases did not evaluate Dr. Gershwin's hourly rate according to the Frantz factors, such a detailed assessment was probably unnecessary because the special masters awarded the amount requested and because the Secretary had not objected to the proposed hourly rate.

The commonly used rate of $500.00 per hour for a medical doctor specializing in immunology is one factor to consider in estimating a reasonable per hour rate of a non-medical doctor specializing in immunology. As discussed above, data from the Department of Labor's Bureau of Labor Statistics suggests that the earnings ratio for doctors to scientists is at least 2.5:1. Thus, by substitution, the hourly rate of a medical doctor should be at least 2.5 times higher than the hourly rate of a scientist. Thus, a reasonable hourly rate for a non-medical doctor specializing in immunology is $200.00 per hour because $500.00 per hour is 2.5 times higher than $200.00 per hour.

This result, which is based upon data from the Bureau of Labor Statistics, is close to (but slightly lower than) the (undersigned's) estimate of the disparity of hourly rates between medical doctors specializing in immunology and Ph.D. immunologists in Dominguez v. Sec'y of Health & Hum. Servs., No. 12-378V, 2018 WL 3028975 (Fed. Cl. Spec. Mstr. May 25, 2018). In Dominguez, based upon a rate of medical doctors specializing in immunology being $450.00 per hour, a reasonable estimate for Ph.D. immunologists was $250.00 per hour (which is 1.8 times lower than the rate for medical doctors). But, the Dominguez estimate was made without using data from the Department of Labor's website discussed above.

In an attempt to learn more about the prevailing rates for scientists with a Ph.D. in immunology, the undersigned searched for cases discussing this topic across all jurisdictions. The undersigned found none, outside of the Vaccine Program. Although the Ennises presented no evidence regarding the market rate for Ph.D. immunologists in their initial briefing (see Remand Oral. Arg. Tr. at 589), they maintained that caselaw established the market rate. Remand Oral Arg. Tr. at 590. Yet, when called upon to identify cases that discuss the market rate for Ph.D. immunologists, the Ennises failed to identify any persuasively comparable cases. See Pet'rs' Status Rep., filed Apr. 3, 2025.

Overall, the evidence preponderates in a finding that, among people who specialize in immunology, people who are medical doctors earn more than people who are not medical doctors. Their hourly rates in litigation should reflect this difference.[18]

This method of starting with well-established rates for medical doctors who specialize in immunology and then adjusting for the disparity in earnings for Ph.D. scientists who lack a medical degree appears to be a reasonable method. See Lewis v. Sec'y of Health & Hum. Servs., 149 Fed. Cl. 308, 314 (2020) (holding that reducing Dr. Akbari's hourly rate because he was not a medical doctor was reasonable). This method may not be the only reasonable method. To the extent other reasonable methods exist, the Ennises have not proposed any method. See Pet'rs' Mot. for Fees, filed Jan. 25, 2025, at 3. In the absence of any method from the Ennises, this approach should bring out a reasonable hourly rate. Cf. Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2011) ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision"); Medart, Inc. v. Austin, 967 F.2d 579, 581-82 (Fed. Cir. 1992) (explaining that the existence of a different method of estimating does not make the government's method unreasonable); Fields for estate of Lawrence v. Sec'y of Health and Hum. Servs., No. 17-1056V, 2022 WL 1573538, at * 8 (May 10, 2022) ("the Special Master's reliance on an objective metric can hardly qualify as an abuse of discretion"), mot. for rev. denied after intervening remand, 2022 WL 4100173 (Aug. 23, 2022).

When asked during oral argument about the market rates for people with Ph.D.'s in immunology, the Ennises stated that evidence was not needed because it is "a matter of case law." Remand Oral Arg. Tr. at 590. Thus, the Ennises were directed to identify the cases discussing the rates for Ph.D. immunologists. The Ennises's response lacked persuasive value.

The April 3, 2026 status report contains statements that are unsupported or inconsistent with the position the Ennises are asserting. To start, the Ennises cite Hernandez for the proposition that a special master applied "the MD rate to a PhD expert due to individual qualifications"). This interpretation appears mistaken because the special master in Hernandez used Dr. Kinsbourne's hourly rate as a proxy for Dr. Akbari's hourly because they are "both physicians." 2018 WL 4391060, at *2; accord Lewis, 149 Fed. Cl. at 315 (recognizing that Hernandez mistook Dr. Akbari for a medical doctor).

Next, the Ennises assert a determination of "a reasonable expert rate requires a fact-specific analysis of the expert's qualifications, including their research specialization, experience, and qualifications to opine in the case." This list includes just a portion of the Frantz factors. What is noticeably missing is the discussion of how people with comparable qualifications are compensated. In other words, the Ennises omit from their list the "market rate." In this context, the Ennises cite Goodwin v. Sec'y of Health & Hum. Servs., No. 16-1676, 2022 WL 6616739, at *6 (Fed. Cl. Spec. Mstr. Sep. 13, 2022). But, Goodwin, does not contain a

---

[18] If a reasonable hourly rate for a Ph.D. immunologist were $500.00 per hour, then a medical doctor who specializes in immunology could easily ask for $1250.00 per hour because $1250.00 per hour is 2.5 times $500.00 per hour.

"fact-specific analysis." Instead, <u>Goodwin</u> cites a series of cases but those cases ultimately rest upon <u>Hernandez</u>.

The same can be said for nearly all of the cases in the April 3, 2026 status report. The Ennises cite many cases, some involving Dr. Akbari, but those cases simply rely upon other cases. It would be a stretch to say that any of the cases engage in the "fact-specific analysis" the Ennises seem to expect. Moreover, none of the cases the Ennises cite present any data (also known as evidence) that suggests that people without medical licenses should be paid as much as people with medical licenses.[19] As discussed above, information from the Bureau of Labor Statistics confirms Judge Hertling's intuitive comment that people with Ph.D.'s but who lack a medical degree earn less, on average, than people with medical degrees. Thus, the compensation here should reflect this real-world difference.

In sum, this decision determines a reasonable hourly rate for Dr. Akbari by comparing the facts of this case to publicly-available data. Although the cases that petitioners presented have been considered, these cases do not overcome this objective data. Nor did petitioners present any evidence or data in support of their position. Without anything to weigh against the existing information on market rates, it is difficult to find petitioners' position persuasive.

A future petitioner may present different evidence and, if so, that evidence would be evaluated in the context of that case. <u>See</u> Remand Oral Arg. Tr. at 537 (Ms. Wilson: "petitioners need to potentially do a better of job of giving the Special Master that individual reasoning"); at 560 (Ms. Wilson: "that's something that certainly petitioners could do a better job of").

        *c)*        *The Nature, Quality And Complexity Of The Information Provided*

Dr. Akbari's task was to explain how vaccines can cause psoriasis. Exhibit 64 at 1. Dr. Akbari's performance was fair.

Some information was complex. This complexity is not surprising in the sense that Dr. Akbari earned a Ph.D. in immunology.

On the other hand, Dr. Akbari did not do an especially good job of making this complex subject understandable to people without advanced degrees in immunology, or at least to this person who lacks an advanced degree in immunology. A small example---although Dr. Akbari lists about 15 medical articles as his references, his report cites a few articles specifically. Thus, the reader is left to connect the references to Dr. Akbari's opinions. Dr. Akbari could have connected the dots much more straightforwardly.

Furthermore, as pointed out during the litigation over entitlement, the Ennises' use of Dr. Akbari's opinion is confusing. On the one hand, the Ennises cited Dr. Akbari's opinion as supporting their claim that the vaccinations harmed B.E. Pet'rs' Brief, filed Mar. 15, 2021, at 39-48. On the other hand, the Ennises did not plan on calling Dr. Akbari as a witness to testify at

---

[19] The Ennises cite <u>Jones v. Sec'y of Health & Hum. Servs</u>, No. 19-023V, 2022 WL 4518812, at *2 (Fed. Cl. Spec. Mstr. Sep. 13, 2022), for the proposition that the special master compared Ph.D. credentials. However, the Ennises fail to note that the special master compensated the expert with a Ph.D., but without a medical license, at $250.00 per hour.

the hearing.  See id. at 62.  The Ennises did not explain why Dr. Akbari would not be part of their team at a hearing.

#### d)    Cost of Living

Dr. Akbari and Dr. Gershwin both live in California.  Thus, using Dr. Gershwin as a prime comparator for Dr. Akbari is reasonable, especially given that the Ennises have not made an argument about the cost of living.

#### e)    Any Other Factor

Here, two topics about Dr. Akbari specifically bear discussing.  (The law firm's payment to the experts was discussed above in the context of Dr. Cupps.)  These are other decisions from special masters discussing Dr. Akbari's overall performance as an expert.  These points are discussed mostly to explain that these count very little, if at all, in the analysis.

##### (1)    Other Decisions from Special Masters

The Ennises accurately point to decisions from other special masters in which Dr. Akbari has been compensated at $500.00 per hour.  See Pet'rs' Mot., filed Jan. 22, 2025, at 3-4; see also Pet'rs' Mot. for Review, filed Aug. 14, 2025, at 18 n.1.  Similarly, during an oral argument, the Ennises emphasized the consistency of previous awards.  Remand Oral Arg. Tr. at 557, 559.

Although the Ennises's request for consistency has some appeal, "consistency," by itself, is not sufficient.  Special masters do not bind each other or even themselves.  See Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019).  Thus, none of those cases control the outcome.  Moreover, "Each attorney fee determination stands or falls on its own merits."  De Souza v. Sec'y of Health and Hum. Servs., 141 Fed. Cl. 338, 347 (2018).

Before the present case, only one appellate authority has reviewed an evaluation of Dr. Akbari's hourly rate.  In Lewis, a judge of the Court of Federal Claims held that the (undersigned) special master's reduction in Dr. Akbari's hourly rate because he did not practice medicine was not arbitrary.  Although Lewis, too, creates binding precedent for a special master only in the context of remand, it would seem that as an opinion from an appellate authority, Lewis deserves at least some mention.  However, the Ennises did not cite Lewis in their underlying motion.  Cf. Remand Oral Arg. Tr. at 545 (Ms. Wilson: petitioners' attorneys should point to any "favorable precedent or even if it's unfavorable precedent").

The presence of Lewis, both in the underlying decision finding Dr. Akbari's hourly rate to be $300.00 and the opinion denying the motion for review, undermines any argument regarding reliance on previous adjudications.  See Remand Oral Arg. Tr. at 557 (discussing reliance on previous awards to Dr. Akbari); Pet'rs' Status Rep., filed Apr. 3, 2026, at 4 (arguing against retroactive reductions of expert rates).  Lewis demonstrates that Dr. Akbari's hourly rate was far from settled.

Of the cases on which the Ennises rely, it appears that none of those decisions analyze Dr. Akbari's hourly rate according to the Frantz factors.  Thus, the Ennises are being inconsistent.  They say that when an expert's hourly rate has been established using the Frantz factors, the hourly rate should not be disturbed.  But, the Ennises are relying upon a series of

23

cases that lack the analysis that they say is critical.  In effect, the Ennises are saying we are happy to rely upon cases without a detailed analysis when those cases support the result we want, but will criticize cases not supporting their preferred outcome for lacking the analysis.  See Remand Oral Arg. Tr. at 561 (Ms. Wilson: after the Frantz factors have been applied to an expert, other special masters should look at the reasoning).

Furthermore, as discussed above, the value of consistency is diminished because the original opinion compensating Dr. Akbari at $500.00 per hour, Hernandez, was based upon a statement that Dr. Akbari was a physician.  The fact that many cases have cited Hernandez or cite cases that rely upon Hernandez does not cure this error.

Of the group of cases that award Dr. Akbari an hourly rate of $500.00 per hour, one warrants more discussion.  On remand from the Federal Circuit, the undersigned awarded Dr. Akbari $500.00 per hour.  Sheller v. Sec'y of Health & Hum. Servs., No. 18-696, 2025 WL 1166239, at *9 (Fed. Cl. Spec. Mstr. Mar. 27, 2025).  That outcome was a mistake.  The undersigned should have followed Lewis but did not.  To follow Sheller here would simply perpetuate an error.  Moreover, the presence of Sheller does not strengthen the Ennises' reliance argument because Sheller was decided in 2025, long after Dr. Akbari wrote his 2018 report for the Ennises.

For these reasons, the presence of alternative outcomes does not mean that Dr. Akbari should be compensated at an unreasonably high rate.

(2)    Dr. Akbari's Overall Performance as an Expert

Another factor potentially relevant is Dr. Akbari's contribution to the Vaccine Program in other cases.  Conceivably, it could be argued that Dr. Akbari has helped so many petitioners that his services merit a premium to incentivize him to continue participating in the Vaccine Program.

However, Dr. Akbari's work in other cases has been mixed.  Examples of cases in which special masters have rejected Dr. Akbari's opinion include: Ampofo-Addo v. Sec'y of Health & Hum. Servs., No. 21-1231V, 2025 WL 2463643, at *19 (Fed. Cl. Spec. Mstr. July 31, 2025) (Dr. Akbari's theory implicating inflammasome, Tregs, and cross-reactive antibodies was unreliable); Ray v. Sec'y of Health & Hum. Servs., No. 20-321V, 2025 WL 3900631, at *24 (Fed. Cl. Spec. Mstr. Dec. 12, 2025) ("Dr. Akbari mischaracterizes the findings, adversely affecting his credibility and the reliability of his opinions"); M.M. v. Sec'y of Health & Hum. Servs., No. 18-583V, 2024 WL 4164557, at *37 (Fed. Cl. Spec. Mstr. Sep. 12, 2024) ("at times, Dr. Akbari mispresents the literature he cites").

Certainly, in other cases, special masters have received Dr. Akbari's opinion more favorably.  But, Ampofo-Addo, Ray, and M.M. illustrate the point that Dr. Akbari is not so outstanding that he should be paid greatly in excess of what an immunologist with a Ph.D., who is not a medical doctor, should be paid.

24

2.    Summary

An analysis of the Frantz factors shows that a reasonable hourly rate for Dr. Akbari's work is $200.00 per hour.[20] The First Fees Decision found that a reasonable number of hours for Dr. Akbari's work was 30.5 hours. Accordingly, pursuant to the lodestar formula, the Ennises are awarded $6,100.00 (30.5 * $200.00) for Dr. Akbari's work.[21]

## IV.    Additional Comments

In Judge Hertling's oral argument, he expressed some reluctance to remanding the motion for attorneys' fees and costs due to the large number of cases pending before special masters. Ct. Oral Arg. Tr. at 34, 37. Nonetheless, Judge Hertling did remand with an expectation that more reasoning be provided. Bench Ruling Tr. at 8. Judge Hertling recognized that a more detailed analysis may produce the same result. Id. at 28.

To the extent that the remand order could be viewed as increasing the transaction costs, the people paying the transaction costs are the parties in other cases. Petitioners other than the Ennises are waiting for their claims regarding entitlement to be decided. Attorneys who represent petitioners in other cases, including some cases involving the Maglio law firm, remain in line for adjudication. Cf. Remand Oral Arg. Tr. at 539-40 (Ms. Maglio recognizing that special masters have many demands on their time).

Meanwhile, the Ennises have not benefited from the motion for review in the sense of receiving a greater amount of money. For the reasons explained in section III.A, a reasonable amount of compensation for Dr. Cupps remains unchanged. For the reasons explained in section III.B, a reasonable hourly rate for Dr. Akbari is actually lower than the rate originally estimated. Moreover, while the motion for review was pending and the case remained on remand, the attorneys have lost the time-value of the $272,876.90 awarded originally.

Whether the outcome of the motion for review affects the Ennises' December 29, 2025 motion for supplemental attorneys' fees and costs is unclear because, at least, the outcome of the motion for review itself is unclear. The parties could potentially pursue additional appellate litigation. See Resp't's Resp., filed Feb. 13, 2026. Thus, adjudication of the motion for supplemental fees is deferred.

## V.    Conclusion

The First Fees Decision awarded $222,255.50 in attorneys' fees and $30,508.90 in attorneys' costs that were not affected by the remand. To these amounts, an amount of $6,100.00 for Dr. Akbari and an amount of $10,200.00 for Dr. Cupps is added. Thus, a reasonable amount of fees and costs for work performed before the July 15, 2025 First Fees Decision is

---

[20] A person earning $200.00 per hour while working 40 hours in a week for 52 weeks would earn more than $400,000 (gross).

[21] Although this amount is lower than the amount awarded in the First Fees Decision, there appears to be no prohibition on awarding a lower amount. See Remand Oral Arg. Tr. at 606 (Ms. Maglio).

25

$269,064.40.  Again, resolution of the motion for supplemental fees, which requests compensation starting with the motion for review, remains deferred.

Accordingly, the undersigned awards $269,064.40 (representing $222,255.50 in attorneys' fees and $46,808.90 in attorneys' costs). This amount shall be paid through an ACH deposit to petitioners' counsel's IOLTA account for prompt disbursement.

The Clerk's Office is directed to provide this decision to the Court.  See Vaccine Rule 28.1(a).  In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[22]

        **IT IS SO ORDERED**.

s/Christian J. Moran<br>
Christian J. Moran<br>
Special Master

---

[22] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.